[828 NYS2d 346]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WINSTON GAJADHAR, Appellant.

First Department, January 23, 2007

## APPEARANCES OF COUNSEL

*Laura R. Johnson, The Legal Aid Society*, New York City (*Paul Wiener* of counsel), for appellant.

*Winston Gajadhar*, appellant pro se.

*Robert M. Morgenthau, District Attorney*, New York City (*Meredith Boylan* and *Hilary Hassler* of counsel), for respondent.

## OPINION OF THE COURT

Tom, J.P.

This appeal raises a novel issue of whether defendant, convicted of the crimes of felony murder and attempted robbery,

waived his constitutional right to trial by a jury of 12 by executing a stipulation to be bound by a verdict rendered by only 11 jurors.

After the jury began deliberations, it was learned that a juror suffering from chronic pancreatitis would require a period of hospitalization of at least 10 days. At defendant's insistence, in lieu of the declaration of a mistrial, he executed a signed waiver of his right to trial by jury pursuant to New York Constitution, article I, § 2 and CPL 270.05, "to the extent that, in view of the unavailability of juror number 9, he requests that he be tried by a jury consisting of the remaining eleven sworn jurors and that deliberations continue to verdict with those jurors." The remaining jurors found defendant guilty of felony murder and first degree attempted robbery, for which the court sentenced him to concurrent terms of 20 years to life and 5 to 15 years, respectively.[1]

Defendant now contends that his conviction by only 11 jurors violated his right to a jury trial, as guaranteed by the New York State Constitution and the Criminal Procedure Law, that the evidence was insufficient to establish his intent to steal property so as to sustain conviction for felony murder and that remarks made during the prosecutor's opening and closing statements deprived him of a fair trial by appealing to the emotions of the jurors. This Court finds defendant's waiver of the right to trial by a jury of 12 valid, the evidence of robbery sufficient and the asserted impropriety of the prosecutor's remarks unpreserved for appellate review and, in any event, without merit. Likewise, we find the contentions raised in defendant's supplemental pro se brief unavailing.

Defendant operated an automobile repair business with his partner, Tony Norng, which, at the time it closed on January 15, 1994, was owed $1,500 for repairs made to a vehicle owned by Sammi Fiki that was intended for use as a taxicab. In dividing the assets of the repair business, it was agreed that defendant would "go to collect from Fiki," who had stopped payment on a check allegedly because the vehicle required additional repairs exceeding the amount of the unpaid bill.

At a meeting at Fiki's office, located in an apartment at 1194 First Avenue in Manhattan, Fiki insisted on discussing the matter only with Norng because he did not know defendant. Defen-

---

**1.** Defendant was acquitted of intentional murder, attempted murder (two counts) and first degree assault (two counts).

dant thereupon placed the returned check on Fiki's desk and left. On January 19, defendant returned, accompanied by another man whose identity was unknown at the time of trial, and knocked on the door to Fiki's office. Inside were Fiki, his brother, Mosad Elfiki and his brother's friend, Hisham Omar. When Elfiki opened the door, the other man told Fiki, "You owe us $1,500." Fiki responded, "I owe you? Who are you? I don't even know you." The man asked defendant, "Is this the guy?" and defendant replied, "Yes, take care of them." Defendant's accomplice then locked the door, and Elfiki told his brother to call the police. As Elfiki wrestled with the man in an attempt to reopen the door, defendant intervened. Elfiki's friend, Hisham Omar, who had been sleeping in an adjoining room, asked what was going on, and defendant told him, "Don't get involved." At that point, Omar noticed that defendant's accomplice was holding a gun and that Elfiki was restraining his hand. Omar felt pain in his abdominal area and realized he had been shot. He also noticed that Elfiki had been shot and yelled to his brother to call for an ambulance.

Fiki was not immediately aware that either of the assailants was holding a gun but saw that the unidentified assailant's arm was outstretched. As he gave a description of the man to a 911 operator, Fiki, too, was shot, whereupon the intruders left, closing the door behind them.

The 911 operator testified that Fiki had described the shooter as a "male black, wearing all black." Asked if a robbery was in progress, Fiki replied that there was no robbery. The operator heard shots, after which Fiki no longer responded.

Fiki managed to open the door for two police officers dispatched to the scene. They found $625 in cash on Fiki and $66 on his brother. The victims were taken to the emergency room at New York Presbyterian Hospital, where Elfiki showed no vital signs and was pronounced dead a short while later. Fiki and Omar both underwent successful operations for gunshot wounds to the abdomen.

In the days following the shooting, detectives learned from Omar that the crime had been committed by two black men, whom he did not recognize. Defendant's former partner in the auto repair business took the detectives to defendant's home, but neighbors informed them that the apartment had been emptied the day before. The detectives suspected that defendant had gone to his native Trinidad. Efforts to locate defendant there were hampered by a treaty between Trinidad and Tobago

and the United States, which required a suspect to be under indictment in order to be subject to extradition. An indictment was obtained against defendant in February 1994.

Some time later, defendant returned from Trinidad to the United States and took a job at the Three Brothers Auto Body shop. Explaining his absence, defendant told the owners that he had to go away for awhile because he was owed money and, when he went to collect it, "things just got out of hand."

Defendant was eventually apprehended when he attempted to enter Trinidad and Tobago using an assumed name. The immigration officer noticed that defendant's passport had been tampered with and placed him under arrest for possession of an altered passport. The officer had copies of reports that had been faxed to the constable's office in Trinidad containing information about the charges against defendant and depicting his photograph. In December 1999, United States marshals brought defendant from Trinidad to New York, where he was taken into police custody.

At trial, Hisham Omar identified defendant as the man who had told him not to get involved moments before the shootings. Some eight years later, Sammi Fiki could only tentatively identify defendant as a person involved in the crime.

On the third day of deliberations, juror number 9 advised the court that she would probably require hospitalization for an attack of pancreatitis. Deliberations continued for the remainder of the day but, the following morning, the stricken juror called to say that she was in the hospital and would probably have to remain there for at least 10 days. Defense counsel told the court, "Given the length of the trial, the number of witnesses involved, and frankly, the availability of eleven jurors who have been working very hard now into the fourth day," defendant was "insisting on it that we should forge ahead with eleven jurors." Defendant executed a written "Waiver of Twelve Person Jury Trial," stating that he had been informed of his right to be tried by a 12-member jury; agreed to waive that right under article I, § 2 of the New York State Constitution as well as CPL article 270; consented to deliberations continuing to a verdict by 11 jurors; opposed the declaration of a mistrial; and, "to the extent that such review may be waived," agreed to waive appellate review of the lawfulness of the waiver. After defendant signed the waiver, the court confirmed that he understood and agreed to its terms after consulting with counsel and that consent had not been induced by threats or promises. The court

held that the waiver was effective and issued an opinion expressing its reasoning (194 Misc 2d 142 [2002]).

■ Defendant now contends that his waiver was ineffective to surmount his fundamental right to be tried by a jury of 12 persons, as required by New York Constitution, article I, § 2 and CPL 270.05. He argues that, based on the venerable precedent of *Cancemi v People* (18 NY 128 [1858]), a defendant in a criminal case may not consent to trial by less than 12 jurors. At issue is whether a criminal verdict rendered by a jury of 11 represents "a fundamental, nonwaivable defect in the mode of procedure" so as to require reversal (*People v Patterson*, 39 NY2d 288, 295 [1976], *affd* 432 US 197 [1977]). As the Court of Appeals stated, "Where the procedure adopted by the court below is at a basic variance with the mandate of law, the entire trial is irreparably tainted" (*id.* at 296).

It is settled that the United States Constitution does not require a defendant charged with a criminal offense be tried by a 12-member jury, the traditional, common-law composition of which the Court attributed to " 'historical accident' " (*Burch v Louisiana*, 441 US 130, 135 [1979], quoting *Williams v Florida*, 399 US 78, 89 [1970] [upholding conviction by a nonunanimous six-person jury]). The New York Constitution, by contrast, is construed to have incorporated the right to a jury of 12 by expressly affording the criminal defendant the same right existing under common law, rendering conviction "otherwise than by a common law jury of twelve . . . without due process of law" (*People v Mitchell*, 266 NY 15, 18 [1934]).[2] This interpretation is clearly reflected in the procedural statute: "A trial jury consists of twelve jurors, but 'alternate jurors' may be selected and sworn pursuant to section 270.30" (CPL 270.05 [1]). Defendant concludes that because he was convicted by only 11 jurors, his "fundamental right" to have his guilt decided by a jury of 12 has been violated.

The issue thus delineated is not whether a criminal defendant in this state has a constitutional right to be tried before a 12-member jury, but whether such right is "fundamental" to the trial process so that its waiver would render the proceedings "irreparably tainted" (*Patterson*, 39 NY2d at 295, 296). "The

---

**2.** NY Constitution, article I, § 2 provides, in material part, "Trial by jury in all cases in which it has heretofore been guaranteed by constitutional provision shall remain inviolate forever" and article VI, § 18 (a) expressly states that, unless trial by jury is waived, "crimes prosecuted by indictment shall be tried by a jury composed of twelve persons."

courts commonly enforce the waiver of rights, even though the defendant has not admitted guilt" (*People v Seaberg*, 74 NY2d 1, 10 [1989] [waiver of right to appeal]). It has long been recognized that constitutional protection is no bar to waiver. "Parties by their stipulations may in many ways make the law for any legal proceeding to which they are parties, which not only binds them, but which the courts are bound to enforce. They may stipulate away statutory, and even constitutional rights" (*Matter of New York, Lackawanna & W. R.R. Co.*, 98 NY 447, 453 [1885]; *Mann v Simpson & Co.*, 286 NY 450, 459 [1941]). "Generally, parties to litigation, even parties to a criminal prosecution, may adopt their own rules at trial by the simple expedient of failing to object to evidence offered or to except to instructions given the jury" (*People v Lawrence*, 64 NY2d 200, 206 [1984]). Waiver need not be explicit but may be inferred from the record of the proceedings (*e.g. People v McElveen*, 234 AD2d 228 [1996], *lv denied* 89 NY2d 1097 [1997] [right to counsel]). In certain circumstances, even a "fundamental" constitutional right is subject to waiver: "The constitutional right to counsel is fundamental to our system of justice (*see* US Const 6th Amend; NY Const, art I, § 6). Implicit in the exercise of this right is the concomitant right to forego the advantages of counsel and represent oneself" (*People v Arroyo*, 98 NY2d 101, 103 [2002]).

"A jury trial may be waived by the defendant in all criminal cases, except those in which the crime charged may be punishable by death" (NY Const, art I, § 2). Waiver is most commonly accomplished, without further formalities, by simply entering a guilty plea in exchange for a stipulated sentence (*e.g. People v Rizzo*, 209 AD2d 235 [1994], *lv denied* 85 NY2d 913 [1995]; *Britt v State of New York*, 260 AD2d 6 [1999], *lv denied* 95 NY2d 753 [2000]). Alternatively, a defendant may dispense with a jury by electing to have the matter tried to the court, in which case waiver is effected "by a written instrument signed by the defendant in person in open court before and with the approval of a judge or justice of a court having jurisdiction to try the offense" (NY Const, art I, § 2; CPL 320.10 [2]).

Defendant takes the uncompromising position that although the right to trial by jury can be waived altogether, where the right is exercised, a defendant's consent to trial by other than 12 jurors is invalid. The identical issue was presented in *Patton v United States* (281 US 276, 287 [1930], *abrogated on other grounds by Williams v Florida*, 399 US 78 [1970]), in which the

defendants consented to proceed with trial before only 11 jurors after one juror became incapacitated because of severe illness. With respect to the effectiveness of the waiver of a single juror—or the entire jury—the Court stated that the trial court possessed "authority in the exercise of a sound discretion to accept the waiver, and, as a necessary corollary, to proceed to the trial and determination of the case with a reduced number or without a jury" (*id.* at 299). The Court discussed and rejected the reasoning of *Cancemi* (18 NY 128 [1858], *supra*), on which defendant relies, noting that the public policy considerations underlying the common-law requirement for trial by a jury of 12 were less than compelling in view of reforms in trial procedure adopted since the 12-person jury became the norm in fourteenth-century England (*see Williams*, 399 US at 89-90), including the right of a defendant to give evidence in his own defense and the right to the assistance of counsel (*Patton*, 281 US at 307-308). As the Court noted, "The public policy of one generation may not, under changed conditions, be the public policy of another" (*id.* at 306).

Defendant has failed to demonstrate that New York law precludes the trial of a criminal defendant by a jury of less than 12 persons. In *People v Ryan* (19 NY2d 100 [1966]), on which he relies, the issue was whether an alternate juror could be substituted for a regular juror some five hours after deliberations had commenced. The Court of Appeals held that the New York Constitution prohibits the substitution of "in effect a 13th juror" after a jury starts deliberating (*id.* at 105). The dispositive concern voiced by the Court was that the deliberative process, once begun, should not be disturbed by the inclusion of a juror who was not party to the jury's deliberation up to the time of the substitution (*id.*), not that a jury of 12 is an immutable requirement for a valid conviction. The Court rejected the People's contention that oral consent to the substitution, given by counsel in defendant's absence, was effective, reasoning that such consent does not satisfy the constitutional requirements for waiving trial by jury (*id.* at 106).

In 1970, the Criminal Procedure Law replaced the Code of Criminal Procedure. To comply with *Ryan*, CPL 270.35 provided that if a defendant wished to replace a deliberating juror with an alternate, the defendant had to consent in writing and in open court (*see People v Page*, 88 NY2d 1, 8-9 [1996]). In *Page*, the Court of Appeals revisited the issue addressed in *Ryan*, noting it had "acknowledged that a defendant could waive the

right to a jury trial—as well as the inclusory right to a jury of 12—and thereby consent to substitution of an alternate for a deliberating juror" (*id*. at 8) as long as the defendant's consent was obtained in the written instrument prescribed by New York Constitution, article I, § 2. If a defendant's written waiver of a jury of 12 constitutes valid consent to the substitution of "in effect a 13th juror" (*Ryan*, 19 NY2d at 105) who did not participate in prior deliberations, a fortiori, it is effective to permit a verdict to be reached by only 11 jurors, all of whom were selected as regular jurors and fully participated in all deliberations. Since the written waiver subscribed by defendant in this case complies with constitutional requirements, *Page* presents no obstacle to the effectiveness of defendant's consent to proceed with trial before a jury of 11 persons.

In light of *Page*, we conclude that earlier authority to the effect that a defendant cannot consent to trial before fewer than 12 jurors (*e.g. Matter of Bell v Sherman*, 174 AD2d 738, 739 [1991]; *Matter of Stressler v Hynes*, 169 AD2d 750 [1991]; *People v Lester*, 149 AD2d 975 [1989], *lv denied* 74 NY2d 742 [1989]) has been implicitly overruled. In sum, defendant is bound by his waiver of the right to be tried by a jury consisting of 12 persons.

■ Defendant's contention that the evidence is insufficient to sustain his conviction for attempted robbery and felony murder because the proof does not support the attempt to steal from any of the victims is without merit. Examined in the light most favorable to the prosecution (*People v Contes*, 60 NY2d 620, 621 [1983]), the evidence establishes that defendant, acting in concert with his armed accomplice, attempted to commit robbery and, in the course of such crime, caused the death of Mosad Elfiki (Penal Law §§ 110.00, 160.00, 160.15 [2]). That the final act necessary to complete the intended crime was not performed does not require the conclusion that steps taken in furtherance of this objective cannot constitute an attempt to obtain property by force (*People v Mahboubian*, 74 NY2d 174, 190 [1989]). "Often there is no direct evidence of a defendant's mental state and the jury must infer the *mens rea* circumstantially from the surrounding facts" (*People v Smith*, 79 NY2d 309, 315 [1992], citing *People v Bracey*, 41 NY2d 296, 301 [1977]).

In the matter at bar, the jury heard testimony that defendant had previously attempted to obtain payment of an alleged debt from Sammi Fiki and had visited Fiki's office in connection with those efforts. On the day of the crime, the accomplice de-

fendant knew to be armed began by telling Fiki, "You owe us $1,500." When Fiki refused to acknowledge the debt, defendant told his accomplice to "take care of them," and the deadly assault followed. While, as defendant contends, the assailants might have harbored only "an intent to injure or, perhaps, even to kill the occupants of the apartment," the jury could reasonably have inferred from the assailants' conduct and the attendant circumstances that, beyond a reasonable doubt, their purpose was to recover the asserted debt by means of force or the threat of force (*Bracey*, 41 NY2d at 301) and that such objective would have been achieved had it not been for their victims' courageous resistance (*see Mahboubian*, 74 NY2d at 191). Fiki's statement to the 911 operator that no robbery was in progress is of no moment; a layperson's perception of unfolding events during the course of a murderous assault is hardly dispositive of the sophisticated legal issue of whether a defendant's acts in furtherance of obtaining property by force were sufficient to constitute the crime of attempted robbery.

The claim that the prosecutor's opening and closing statements deprived defendant of a fair trial is unpreserved by timely objection to the remarks now alleged to be inflammatory, and we decline to reach the issue in the interest of justice. Defendant's sole objection that the prosecutor "was going through all the medical injuries" was met with the explanation that the People were required to establish serious physical injury. Defendant raised no further objection and requested no curative instructions. His claim of prosecutorial misconduct is therefore unpreserved for appellate review (*see People v Tonge*, 93 NY2d 838, 839-840 [1999]; *People v Balls*, 69 NY2d 641, 642 [1986]). Were we to entertain the issue, we would conclude that the prosecutor's description of the injuries sustained by the victims was an accurate summary of the medical evidence received at trial. Nor can it be said that the prosecutor's conduct, when viewed in its entirety, deprived defendant of his right to a fair trial (*People v D'Alessandro*, 184 AD2d 114, 118-119 [1992], *lv denied* 81 NY2d 884 [1993]). It should be noted that defendant was acquitted of intentional murder, attempted murder and assault, suggesting that the jury followed the court's instructions and relied on the evidence, not emotion (*see People v Miller*, 8 AD3d 176, 177 [2004], *affd in relevant part* 6 NY3d 295 [2006]).

The claims raised in defendant's supplemental pro se brief are devoid of merit. His contention that two jurors were disqualified without an adequate hearing is unpreserved and

unavailing (*see People v Torres*, 80 NY2d 944 [1992]; *People v Wilson*, 278 AD2d 65 [2000], *lv denied* 96 NY2d 789 [2001]). His claim of ineffective assistance of counsel should be properly raised in a CPL article 440 application since it implicates facts outside the record (*see People v Brown*, 45 NY2d 852, 854 [1978]) and warrants an explanation by counsel (*see People v Gil*, 285 AD2d 7, 11 [2001]). To the extent that defendant's claim rests on the decision to proceed with 11 jurors, we note that this was a strategic decision predicated on the belief that repeated notes from the jury during four days of deliberations pointed toward acquittal. Failed trial tactics do not invariably indicate ineffectiveness (*see People v Rivera*, 71 NY2d 705, 708 [1988]), and there is no reason to suspect that another jury would have reached a different conclusion on the evidence.

■ As to the disposition of defendant's *Batson* objections, the court properly conducted an analysis of the People's peremptory challenges and concluded that the prosecutor's race-neutral explanations were not pretextual (*see People v Simpson*, 254 AD2d 150 [1998], *lv denied* 92 NY2d 1038 [1998]). The prosecutor was entitled to strike jurors who, variously, appeared to be sleeping, were offended by questioning, had distracting body art and a peculiar job, were lacking in life experience or had been convicted of a crime.

This Court has examined defendant's remaining contentions and finds them to be without merit.

Accordingly, the judgment of the Supreme Court, New York County (Michael Obus, J.), rendered June 16, 2003, convicting defendant, after a jury trial, of murder in the second degree and attempted robbery in the first degree, and sentencing him to concurrent terms of 20 years to life and 5 to 15 years, respectively, should be affirmed.

FRIEDMAN, SULLIVAN, CATTERSON and MALONE, JJ., concur.

Judgment, Supreme Court, New York County, rendered June 16, 2003, affirmed.